**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WATERSIDE COMMERCIAL FINANCE, INC., | Civil Action No.  1:24-cv-01284 (LEK/DJS) |
| *Plaintiff,* | **COMPLAINT** |
| v. | **[DEMAND FOR JURY TRIAL]** |
| GROWTH LENDING, LLC and LADISLAS MYSYROWICZ, individually | |
| *Defendants.* | |

Plaintiff, Waterside Commercial Finance, Inc. ("**Plaintiff**" or "**Waterside**"), by and through its attorneys, Nissenbaum Law Group, LLC, for and by its Complaint against Defendants Ladislas Mysyrowicz ("**Mysyrowicz**") and Growth Lending, LLC ("**Growth**") (collectively, "**Defendants**") alleges, on knowledge as to its own actions, and otherwise upon information and belief, as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      This action arises from Defendants' refusal to pay Plaintiff agreed upon initial fees and exit fees or otherwise compensate Plaintiff for the work it performed for Defendants, and from Defendants' benefitting from Plaintiff's contacts in violation of their written and signed agreement, the terms of which are more fully set forth in **Exhibit A** (the "**Agreement**").

2.      Growth, a United Kingdom-based entity, is a privately held specialist finance provider that offers funding solutions to small and medium-sized businesses. At the time of its initial encounter with Plaintiff, Growth had limited operations in the United States and was unaware of the program that Plaintiff created, which involved USDA bridge loans. Growth was, during the relevant time period, actively seeking to expand its United States operations. Plaintiffs had valuable contacts in the USDA loan market. Growth partnered with Plaintiff to identify

1

potential funding opportunities and to facilitate the lending process. In return, Growth agreed to pay Plaintiff, without limitation: (1) an initial fee of 0.25% of the total loan amount upon closing, and (2) an exit fee of 0.75% of the total loan amount upon repayment of any loan facilitated by Plaintiff. In addition, Growth agreed to refrain from contacting or entering into deals with any borrower introduced by Plaintiff without Plaintiff's express written permission. Plaintiff spent considerable time, effort and resources identifying borrowers to introduce to Growth .

3.      For example, Plaintiff identified and introduced Growth to:

a.   Pennsylvania Social Equity Land Trust ("**PSELT**"), and introduced the PSELT deal to Defendant on May 22, 2023. The $9,000,000.00 loan was ultimately funded between April 29, 2024 and April 30, 2024. Growth failed to pay Plaintiff the initial fee and the exit fee in connection with this loan.

b.   Ballpark National ("**Ballpark**"), and introduced the Ballpark deal to Growth on July 26, 2023. The $6,000,000.00 loan was ultimately funded on or about October 12, 2023. This loan was repaid in July 2024. Growth failed to pay Plaintiff the initial fee and the exit fee in connection with this loan.

c.   Titusville ("**Titusville**"), and introduced the Titusville deal to Growth on August 9, 2023. The $9,500,000.00 loan was ultimately funded between November 17, 2023. Growth failed to pay Plaintiff the initial fee and the exit fee in connection with this loan. Upon information and belief, Growth and Titusville subsequently signed closing documents on August 12, 2024 for an additional $7,200,000.00 loan, without Plaintiff's knowledge or express written permission.

4.      In this action, Plaintiff seeks to recover the fees it is entitled to, compensation for the efforts it expended and all related damages it suffered from Defendants' wrongful conduct.

## PARTIES

5.      Plaintiff is a Canadian corporation with its principal place of business located at 3964 Garnetwood Chase, Mississauga, Ontario, Canada L4W2G8.

6.      Upon information and belief, Growth is a limited liability company organized and registered in New York, and its principal place of business is located at 8735 Dunwoody Place, Suite N, Atlanta, Georgia 30350. Growth regularly conducts business in New York State.

7.      Upon information and belief, Mysyrowicz was and is a citizen of the State of New York.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332(a). This is a civil action where the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiff and Defendants.

9.      Venue is proper in this judicial district because it is where a substantial part of the events or omissions giving rise to Plaintiff's claims occurred. *See* 28 U.S.C. § 1391(b).

10.     Venue is also proper since the Agreement, which was signed by the parties, designates New York as the choice of law.

11.     This Court may exercise personal jurisdiction over Growth because it transacted business within the State—specifically with Plaintiff—and this action arises out of that business. Plaintiff and Defendants entered into an Agreement. The Agreement was entered into in New York and contemplated Defendants' performance thereunder in New York.

12.     Growth is also registered to do business in New York.

3

13.    Upon information and belief, Mysyrowicz is a citizen of New York.

## GENERAL ALLEGATIONS

14.    Plaintiff, founded by Frank Romita ("**Mr. Romita**"), specializes in the origination of USDA-backed loans including, without limitation, USDA bridge loans.

15.    Plaintiff, through its experience working with borrowers pursuing USDA loans, recognized that borrowers needed assistance in securing bridge financing to cover the financial gap until their USDA loans were funded.

16.    Plaintiff launched a bridge financing program and, by partnering with lenders, has been engaged in the sourcing and referring of USDA-backed loans since 2021.

17.    Through its program, Plaintiff became an industry expert on how to properly bridge USDA loans, identified reasons on why this had not been done in the past and outlined pitfalls to avoid and strategies to mitigate risk.

18.    Over several years, Plaintiff cultivated relationships and established strong personal and business connections with key USDA lenders

19.    Plaintiff sought to establish a USDA bridge financing fund in order to address a critical gap in the market, specifically, providing bridge capital to borrowers awaiting USDA-backed loans.

20.    Plaintiff generates revenue by providing professional services to assist clients with the loan funding process and is also paid fees by lenders and borrowers.

21.    At the time of its initial encounter with Plaintiff, Growth had limited operations in the United States and was completely unaware of the existence of USDA bridge loans.

22.    Growth (formerly, Boost and Co.) was, during the relevant time period, actively seeking to expand its United States operations.

23.    Plaintiff had and has valuable contacts in the USDA loan market.

24.     On or about November 18, 2022, Plaintiff began communicating with Mysyrowicz, Growth's principal, and Carl Giannotta, Growth's Head of Fundraising, regarding bringing to market Plaintiff's niche financing product designed to fill a gap in the USDA-backed lending industry and invited Growth to assist in capital raising efforts to fund the bridge product.

25.     Growth recognized that Plaintiff offered valuable connections to potential borrowers and financing opportunities.

26.     Growth partnered with Plaintiff to identify potential funding opportunities to Growth and to facilitate the lending process by referring loans between potential borrowers and Growth.

27.     On January 5, 2023, the parties executed a mutual non-disclosure agreement ("**MNDA**") restricting the parties' use of confidential information only for the purpose of "analyzing and assessing a potential transaction between the Parties." *See* **Exhibit B**.

28.     The MNDA was signed by Mysyrowicz, who is authorized by Growth to act on its behalf, and provides, in relevant part:

> "Confidential Information" means any information, whether printed, in machine readable form or otherwise, that is proprietary or confidential to the Disclosing Party and disclosed to the Recipient, including, without limitation, formulations, know-how, trade secrets, specifications, design plans, drawings, software, hardware, data, research, prototypes, customer information, marketing plans or information, or other business or technical information, and which is (a) disclosed by the Disclosing Party in writing and is marked as "Confidential" (or like designation) at the time of disclosure, or (b) disclosed by the Disclosing Party in any other manner and is identified as confidential at the time of disclosure.
>
> *Id*. at 1.

29.    Ultimately, on August 15, 2023, the parties executed an agreement (the "**Agreement**"), outlining Plaintiff's fees for all loans introduced by Plaintiff to Growth between January 1, 2023 to August 15, 2023 (the "**Relevant Period**"). *See* **Exhibit A**.

30.    This Agreement also included a non-circumvention provision ("**Non-Circumvention Provision**"). *Id.*

31.    Growth agreed not to engage, communicate, negotiate with, or solicit any borrower introduced by Plaintiff without the explicit written permission of Plaintiff for each individual transaction. This included all prospective borrowers introduced by Plaintiff during the relevant period. *Id.*

32.    Growth further agreed to obtain Plaintiff's explicit written permission from Plaintiff on a per-deal basis before engaging borrowers introduced by Plaintiff during the relevant period.

33.    Plaintiff agreed to share confidential information with Growth.

34.    The Agreement was signed by Mysyrowicz, who is authorized by Growth to act on its behalf, and provides, in relevant part:

### AGREEMENT BETWEEN WATERSIDE COMMERCIAL FINANCE, LLC AND GROWTH LENDING LLC

This Agreement ("Agreement") is entered into as of August 15, 2023, by and between Waterside Commercial Finance, LLC, a Delaware limited liability company ("Waterside"), and Growth Lending LLC a limited liability company organized under the laws of the State of Georgia ("Growth Lending").

**1. Scope of Services**

Waterside shall introduce potential funding opportunities to Growth Lending, facilitating the lending process by brokering loans between potential borrowers and Growth Lending.

**2. Compensation**

    a. Retroactive Application: The fee structure outlined in this Section 2 shall apply retroactively to all loans introduced by Waterside to Growth Lending from January 1, 2023, to August 15, 2023 ("Relevant Period"). Growth Lending acknowledges and agrees that it owes Waterside fees for any past loans that were introduced by Waterside in accordance with this fee structure, should they be executed.

    b. Initial Fee: Upon the closing of any loan facilitated by Waterside during the above-mentioned period, Growth Lending agrees to pay Waterside a fee equivalent to twenty-five basis points (25 bps) of the total loan amount. This fee shall be paid at the time of loan closing.

    c. Exit Fee: Upon the repayment of any loan facilitated by Waterside during the above-mentioned period, Growth Lending agrees to pay Waterside an exit fee equivalent to seventy-five basis points (75 bps) of the total loan amount.

    d. Future Engagements: The fee structure specified in this Section 2 is strictly for loans introduced between January 1, 2023, to August 15, 2023. Any future engagements or loans introduced after August 15, 2023, will require a separate agreement detailing the compensation structure, and this Agreement does not imply any willingness by Waterside to accept this or any other fee structure for future loans.

*  *  *

**3. Non-Circumvention**

Growth Lending agrees not to, directly or indirectly, engage, communicate, negotiate with, or solicit any borrower introduced by Waterside without the explicit written permission of Waterside for each individual transaction. This includes all prospective borrowers introduced to Growth Lending in the Relevant Period.

**4. Permission to Engage Borrowers**

Growth Lending must obtain explicit written permission from Waterside on a per-deal basis before engaging with borrowers introduced by Waterside in the Relevant Period.

*Id*. at 1-2.

35.     Plaintiff endeavored to identify potential funding opportunities to provide to Growth, and facilitated the lending process by referring loans between potential borrowers and Growth.

36.     On or about May 22, 2023, Plaintiff contacted Growth by email to introduce to Growth the Pennsylvania Social Equity Land Trust ("**PSELT**") deal.

37.     Plaintiff shared with Growth a brief summary of the opportunity and provided Growth with the documents necessary for the transaction.

38.     The PSELT loan was for $9,000,000.00.

39.     The PSELT loan was funded between April 29, 2024 and April 30, 2024.

40.     Defendant failed to pay Plaintiff its initial fee of 0.25% of the total loan amount.

41.     Growth does not intend to honor its obligations to Plaintiff to pay the exit fees of 0.75% of the total loan amount upon repayment of the PSELT loan.

42.     On or about April 25, 2024, Growth attempted to renegotiate Plaintiff's borrower-related fees with PSELT.

43.     Growth did not have Plaintiff's express written permission to renegotiate Plaintiff's fees with PSELT in or around April 2024.

44.     Those borrower-related fees are separate and distinct from the fees Growth was required to pay Plaintiff under the Agreement.

45.     Ultimately, Plaintiff was forced to reduce its fee by $15,000.00.

46.     Plaintiff demanded that Growth perform its obligations under the Agreement to pay Plaintiff's 0.25% fee.

47.     Growth did not respond to Plaintiff's demand.

48.     Thus, Growth breached its obligations to Plaintiff to pay Plaintiff its initial fee for the PSELT loan.

49.     On or about July 26, 2023, Plaintiff contacted Growth by email to introduce to Growth the Ballpark National ("**Ballpark**") deal.

50.     Plaintiff shared with Growth a comprehensive summary of the opportunity with Ballpark and provided Growth with the documents necessary for the transaction.

51.     The Ballpark loan amounted to $6,000,000.00.

52.     On or about October 12, 2023, the Ballpark loan was funded.

53.     Growth failed to pay Plaintiff its initial fee for the Ballpark loan.

54.     In or around July 2024, the Ballpark loan was repaid.

55.     Growth failed to pay Plaintiff its exit fee for the Ballpark loan.

56.     Even though Plaintiff's introduction of the Ballpark loan fell within the Relevant Period, Growth failed to pay Plaintiff the fees to which Plaintiff is entitled for introducing and sourcing this deal, including the initial fee of 0.25% of the total loan amount upon closing and the exit fee of 0.75% of the total loan amount upon repayment of the loan.

57.     Plaintiff demanded that Growth perform its obligations under the Agreement.

58.     Specifically, on or about April 4, 2024, Plaintiff sent to Growth an invoice, requesting payment of the fees owed for the Ballpark National, LLC transaction.

59.     On multiple occasions thereafter, Plaintiff made numerous demands to Growth for payment.

60.     Growth wrongfully and improperly failed to respond to Plaintiff's demand for payment under the Agreement, or otherwise perform under the Agreement.

61.    Despite sending the invoice, and despite the Ballpark loan closing in or around July 2024, Growth has failed to make the required payment.

62.    Growth's silence to Plaintiff's demand constitutes admission by silence.

63.    On or about August 9, 2023, Plaintiff contacted Growth by email to introduce to Growth to the Titusville ("**Titusville**") deal.

64.    Plaintiff shared with Growth a brief summary of the Titusville opportunity and provided Growth with the documents necessary for the transaction.

65.    The Titusville loan amounted to $9,500,000.00.

66.    On or about November 17, 2023, the Titusville loan was funded.

67.    Even though Plaintiff's introduction of the Titusville loan fell within the Relevant Period, Growth failed to pay Plaintiff the fees to which Plaintiff is entitled for introducing and sourcing this deal, including the initial fee of 0.25% of the total loan amount upon closing.

68.    Upon information and belief, on or about August 12, 2024, Growth closed on a second loan with Titusville for an additional $7,200,000.00.

69.    Growth excluded Plaintiff from that second loan with Titusville.

70.    Growth did not have Plaintiff's express written permission to negotiate that second loan with Titusville.

71.    Growth has repudiated its Agreement with Plaintiff and unequivocally does not intend to honor its obligations to Plaintiff to pay the exit fees of 0.75% of the total loan amount upon repayment of the Titusville loan facilitated by Plaintiff.

72.    Plaintiff demanded that Growth perform its obligations under the Agreement.

73.    Growth wrongfully and improperly failed to respond to Plaintiff's demand for payment under the Agreement, or otherwise perform under the Agreement.

74.     Growth's silence to Plaintiff's demand constitutes admission by silence.

75.     As a direct and proximate consequence of Defendants' breaches, Plaintiff has suffered damages greater than $75,000.00 to be determined at trial.

## FIRST CLAIM FOR RELIEF
## BREACH OF CONTRACT (INITIAL FEE AGREEMENT)

76.     Plaintiff repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

77.     Plaintiff and Growth entered into a valid Agreement.

78.     Plaintiff agreed to identify potential borrowers and to introduce them to Growth .

79.     Growth agreed to pay an initial fee of 0.25% of the total loan amount upon closing.

80.     Plaintiff performed its obligation under the contract by, among other things, identifying and introducing PSELT, Ballpark and Titusville, three ready, willing and able borrowers, to Growth, who ultimately borrowed $31,700,000.00 altogether.

81.     All three loans closed.

82.     Growth failed to pay Plaintiff its 0.25% initial fee on all three loan closings.

83.     Thus, Growth breached the Agreement by failing to pay Plaintiff its initial fee of 0.25% for the PSELT, Ballpark and Titusville loans.

84.     Growth acted in bad faith by failing to pay Plaintiff the fee it was obligated to pay under the Agreement.

## SECOND CLAIM FOR RELIEF
## BREACH OF CONTRACT (EXIT FEE AGREEMENT)

85.     Plaintiff repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

86.     Plaintiff and Growth entered into a valid agreement.

87.     Plaintiff agreed to identify potential borrowers and to introduce them to Growth.

88.     Growth agreed to pay an exit fee of 0.75% of the total loan amount upon repayment of any loan facilitated by Plaintiff.

89.     Plaintiff performed its obligation under the contract by, among other things, identifying and introducing PSELT, Ballpark and Titusville, three ready, willing and able borrowers, to Growth , who ultimately borrowed $31,700,000.00, altogether.

90.     The $6,000,000.00 loan to Ballpark was ultimately funded between October 12, 2023 and was repaid in July 2024.

91.     Growth failed to pay Plaintiff's 0.75% closing fee for the Ballpark Loan.

92.     Thus, Defendant breached the Agreement.

93.     Growth acted in bad faith by failing to pay Plaintiff the fee it was obligated to pay under the Agreement.

**THIRD CLAIM FOR RELIEF**
**ANTICIPATORY BREACH OF CONTRACT (EXIT FEE AGREEMENT)**

94.     Plaintiff repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

95.     Plaintiff and Growth entered into a valid agreement.

96.     Plaintiff agreed to identify potential borrowers and to introduce them to Growth .

97.     Growth agreed to pay an exit fee of 0.75% of the total loan amount upon repayment of any loan facilitated by Plaintiff.

98.     Plaintiff performed its obligation under the contract by, among other things, identifying and introducing PSELT, Ballpark and Titusville, three ready, willing and able borrowers, to Growth, who ultimately borrowed $31,700,000.00, altogether.

99.     Growth has repudiated its Agreement with Plaintiff and unequivocally does not intend to honor its obligations to Plaintiff to pay the exit fees of 0.75% of the total loan amount upon repayment of the PSELT and Titusville loans facilitated by Plaintiff.

100.     For example, Defendants have already failed to pay Plaintiff its exit fees with regard to the Ballpark deal.

101.     Plaintiff demanded in writing that Growth perform its obligations under the Agreement.

102.     Growth wrongfully and improperly failed to respond to Plaintiff's demand for payment under the Agreement, or otherwise perform under the Agreement.

103.     Growth's silence to Plaintiff's demand constitutes admission by silence.

104.     Growth acted in bad faith by failing to pay Plaintiff the fee it was obligated to pay under the Agreement.

**FOURTH CLAIM FOR RELIEF**
**BREACH OF CONTRACT (NON-CIRCUMVENTION AGREEMENT)**

105.     Plaintiff repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

106.     The Agreement entered into between Plaintiff and Growth included a non-circumvention provision ("**Non-Circumvention Provision**"). *See* **Exhibit A** section 3.

107.     Plaintiff agreed to share confidential information with Growth.

108.     Growth agreed not to engage, communicate, negotiate with, or solicit any borrower introduced by Plaintiff without the explicit written permission of Plaintiff for each individual transaction. This included all prospective borrowers introduced by Plaintiff during the relevant period. *Id.*

109.    Growth further agreed to obtain Plaintiff's explicit written permission from Plaintiff on a per-deal basis before engaging borrowers introduced by Plaintiff during the relevant period.

110.    Plaintiff performed its obligation under the Agreement and introduced multiple borrowers to Growth.

111.    Without limitation, Plaintiff introduced the following borrowers to Growth: PSELT, Ballpark and Titusville.

112.    Growth communicated with Titusville without Plaintiff's express written permission.

113.    Growth made a second deal with Titusville for $7,200,000.00 without Plaintiff's knowledge or express written permission.

114.    Thus, Growth breached the non-circumvention provision thereby causing Plaintiff damage.

115.    In fact, Plaintiff was also working on a deal with Titusville at the same time Growth was negotiating its deal.

116.    Titusville ultimately declined the deal with Plaintiff due to its deal with Growth.

117.    On or about April 25, 2024, Growth attempted to renegotiate Plaintiff's borrower-related fees with PSELT.

118.    Defendant did not have Plaintiff's express written permission to renegotiate Plaintiff's fees with PSELT in or around April 2024.

119.    Those borrower-related fees are separate and distinct from the fees Growth was required to pay Plaintiff under the Agreement.

120.    Ultimately, Plaintiff was forced to reduce its fee by $15,000.00 thereby causing it damage.

121.    Thus, Growth circumvented Plaintiff's deal in breach of the Agreement causing Plaintiff damage.

122.    Upon information and belief, Growth has communicated with other borrowers introduced by Plaintiff without Plaintiff's express written permission thereby breaching the non-circumvention provision and causing Plaintiff additional damages.

123.    Growth's actions constitute a breach of the Non-Circumvention Provision in their Agreement, and makes Defendant liable for damages to be determined later.

124.    As a direct and proximate consequence of Growth's breach, Plaintiff has suffered damages of additional monies to be determined later.

## FIFTH CLAIM FOR RELIEF
### FRAUD

125.    Plaintiff repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

126.    Plaintiff and Defendants intended on forming an Agreement.

127.    Plaintiff agreed to enter into this Agreement, and ultimately divulge confidential information, based exclusively on Defendants' promise that Growth would pay Plaintiff: (1) an initial fee of 0.25% of the total loan amount upon closing, and (2) an exit fee of 0.75% of the total loan amount upon repayment of any loan facilitated by Plaintiff.

128.    But for this promise, Plaintiff would never have entered into an Agreement with Growth, nor would it have divulged confidential information.

129.    Mysyrowicz never disclosed to Plaintiff that Growth would not, in fact, pay Plaintiff the fees outlined in the Agreement.

130.    Instead, Mysyrowicz fraudulently induced Plaintiff to enter into an Agreement with Growth, knowing that Growth was not going to pay the fees outlined in the Agreement.

131.    Mysyrowicz fraudulently induced Plaintiff into the Agreement for the sole purpose of obtaining its confidential information.

132.    Defendants used Plaintiff's confidential information and benefitted from several multi-million-dollar loans which it would not have received but for its deceit.

133.    As a direct and proximate consequence of Defendants' fraud, Plaintiff has suffered damages greater than $75,000.00 to be determined at trial.

**SIXTH CLAIM FOR RELIEF**
**<u>FRAUDULENT CONCEALMENT</u>**

134.    Plaintiff repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

135.    Plaintiff and Defendants intended on forming an Agreement.

136.    Plaintiff agreed to enter into this Agreement, and ultimately divulge confidential information, based exclusively on Defendants' promise that Growth would pay Plaintiff for its services.

137.    Mysyrowicz concealed and failed to disclose that he had no intention of paying the fees to Plaintiff as outlined in the Agreement.

138.    Mysyrowicz had a duty to disclose complete and accurate information about his intent to pay Plaintiff.

139.    Mysyrowicz concealed and failed to disclose that he intended to use the confidential information provided to him by Plaintiff in order to circumvent Plaintiff and unfairly compete with Plaintiff.

140.    Plaintiff could not have discovered this information, and therefore the Mysyrowicz's failure to disclose complete and accurate information rendered the parties' transaction inherently unfair.

141.    Mysyrowicz knew that this omission was material information Plaintiff required.

142.    Mysyrowicz intended to deceive Plaintiff into believing that, by entering into the Agreement with Growth, Growth would pay Plaintiff the fees outlined in the Agreement.

143.    Mysyrowicz deliberately concealed this information to induce Plaintiff into the Agreement for the sole purpose of obtaining its confidential information.

144.    In entering into this Agreement, Plaintiff reasonable relied on Mysyrowicz's omission.

145.    As a direct and proximate consequence of Mysyrowicz's misrepresentation, Plaintiff has suffered damages greater than $75,000.00 to be determined at trial.

### SEVENTH CLAIM FOR RELIEF
### NEGLIGENT MISREPRESENTATION

146.    Plaintiff repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

147.    Plaintiff and Defendants intended on forming an Agreement.

148.    Plaintiff agreed to enter into this Agreement, and ultimately divulge confidential information, based exclusively on Mysyrowicz's promise that Growth would pay Plaintiff for its services.

149.    Mysyrowicz misrepresented to Plaintiff that Defendants would pay Plaintiff.

150.    Mysyrowicz made these misrepresentations negligently.

151.    When making these misrepresentations, Mysyrowicz knew that these promises were desired by Plaintiff for a serious and particular purpose: to provide Defendant with confidential information in exchange for payment fees.

152.    When making these statements, Mysyrowicz knew that Plaintiff would rely upon these statements in making its decision to enter into the Agreement with Growth and to Provide Growth with confidential information.

153.    Mysyrowicz further knew that when these statements were made, that any false or erroneous information provided to Plaintiff could cause damage.

154.    Plaintiff reasonably relied upon the Mysyrowicz's negligent misrepresentations, when agreeing to provide Growth with its confidential information.

155.    But for this promise, Plaintiff would never have entered into an Agreement with Growth, nor would it have divulged confidential information.

156.    Defendants used Plaintiff's confidential information and benefitted from several multi-million-dollar loans which it would not have received but for its negligent misrepresentations.

157.    As a direct and proximate consequence of Mysyrowicz's misrepresentation, Plaintiff has suffered damages greater than $75,000.00 to be determined at trial.

**EIGHTH CLAIM FOR RELIEF**
**<u>MISAPPROPRIATION OF TRADE SECRETS</u>**

158.    Plaintiff repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

159.    Plaintiff agreed to enter into this Agreement, and ultimately divulge confidential information.

160.    The documents and information provided by Plaintiff to Defendants qualify as trade secrets under New York law because they contained proprietary information regarding Plaintiff's business, operations, services, clients, pricing, sales and marketing strategies, and other confidential business and/or financial information that was secret, valuable in the bridge loans industry, and had not been disclosed to anyone outside the company.

161.    Plaintiff took reasonable steps to protect the confidentiality of these documents and information.

162.    Plaintiff's trade secrets were not accessible to anyone outside the Company and obtaining access to documents containing trade secrets and proprietary information required an executed confidentiality agreement.

163.    Plaintiff invested significant time and money in the development and protection of its trade secrets and proprietary information, which is valuable to, and cannot be easily acquired or duplicated by its competitors.

164.    The parties executed an MNDA to gain access to the proprietary information and trade secrets. *See* **Exhibit B.**

165.    Defendants were able to, and did, view and download thousands of Plaintiff's documents containing proprietary information and trade secrets.

166.    Defendants' actions constitute willful misappropriation of trade secrets and Proprietary Information under New York law. By using the documents they viewed and downloaded containing Plaintiff's trade secrets and proprietary information to compete with Plaintiff, Defendants breached the confidential relationship and duty imposed on them by the MNDA permitting them access to Plaintiff's confidential information.

167.    Defendants have improperly retained documents and information containing Plaintiff's trade secrets and proprietary information in violation of their MNDA.

168.    Defendants used the misappropriated proprietary information and trade secrets to unfairly compete with Plaintiff. Growth has reorganized its business model to focus on providing USDA bridge loans, like Plaintiff.

169.    It has reorganized its bridge loan structure to replicate Plaintiffs' model.

170.    Using sensitive information, Defendants are concentrating their efforts on borrowers introduced by Plaintiff to Defendants.

171.    Defendants' misappropriation of Plaintiff's trade secrets and proprietary information has caused Plaintiff to suffer harm, including but not limited to the loss of client revenue, loss of reputation and goodwill, and loss of the confidentiality of, and investment in, its trade secrets.

172.    Defendants caused injury when they acquired Plaintiff's trade secrets and confidential information under false pretenses, and then used the trade secrets to unfairly compete with Plaintiff.

173.    Defendants continue to use the misappropriated trade secrets and are irreparably harming Plaintiff.

174.    Defendants' actions are especially gross, wanton and egregious given the calculated nature of the misappropriation and the great lengths to which Defendants went to hide their actions, and, accordingly, Plaintiff is entitled to recover punitive damages in an amount to be determined by a trier of fact.

175.    Plaintiff is entitled to full compensatory and consequential damages, a full accounting of Defendants' profits, punitive damages, as well as attorneys' fees, costs, and expenses.

176.    Accordingly, Plaintiff demands judgment against Defendants for compensatory damages, punitive damages, prejudgment interest, an award of reasonable attorneys' fees and costs pursuant to New York law, and such other relief as the Court deems just and proper.

### NINTH CLAIM FOR RELIEF
### *QUANTUM MERUIT*

177.    Plaintiff repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

178.    Plaintiff performed services to Growth's benefit.

179.    Plaintiff performed those services in good faith.

180.    Growth accepted and benefited from Plaintiff's services.

181.    Plaintiff expected to be compensated for its services.

182.    The services performed by Plaintiff had substantial value.

183.    Growth would never have benefitted from such value but for the services of Plaintiff.

184.    Growth has not compensated the Plaintiff for its services.

185.    Plaintiff is entitled to recover from Growth based on *quantum meruit* the full value of the services it performed for Growth.

### TENTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT

186.    Plaintiff repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

187.    Plaintiff performed services for Growth.

188.    Plaintiff conferred a material benefit on Growth.

189.    Growth benefitted from these services at the expense of Plaintiff.

190.    Growth has not compensated Plaintiff for those services.

191.    It is against equity and good conscience to permit Growth to retain the benefit of Plaintiff's services without compensating Plaintiff.

192.    Growth has been unjustly enriched in an amount to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF
## ESTOPPEL

193.    Plaintiff repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

194.    Growth agreed to compensate Plaintiff for its services.

195.    Plaintiff reasonably and foreseeably relied on Defendants' promises to its detriment by expending time and effort to identify potential borrowers to Growth and to teach Growth how to utilize USDA bridge loans.

196.    Plaintiff demanded in writing that Growth perform its obligations under the Agreement.

197.    Growth failed to respond to Plaintiff's demand for payment.

198.    Growth failed to challenge or otherwise dispute the facts contained in Plaintiff's demand.

199.    Growth's silence to Plaintiff's demand constitutes admission by silence.

200.    At all relevant times, Growth was aware of Plaintiff's reliance on Growth's promise to compensate Plaintiff.

201.    Growth should be estopped from disavowing its obligations to pay Plaintiff fees in connection with Plaintiff's performance of services.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

202.    Granting Plaintiff compensatory damages against Defendants in an amount to be determined at trial, but in a sum of no less than $75,000.00;

203.    Granting punitive damages against Defendants;

204.    Granting Plaintiff pre-judgment interest on all amounts due;

205.    Granting Plaintiff its full costs, including reasonable attorneys' fees and expenses; and

206.    Granting Plaintiff such other and further relief as the Court may consider equitable, just, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury for all issues so triable in this case.

Respectfully submitted,

Dated: October 18, 2024             By: _/s/ Anthony C. Gunst IV_
                                    Anthony C. Gunst, IV (5731203)
                                    **NISSENBAUM LAW GROUP, LLC**
                                    2400 Morris Avenue, Suite 301
                                    Union, New Jersey 07083
                                    Tel:  908-686-8000
                                    Fax: 908-686-8550
                                    ag@gdnlaw.com
                                    *Attorneys for Plaintiff, Waterside Commercial Finance, Inc.*

23

# EXHIBIT A



**AGREEMENT BETWEEN**
**WATERSIDE COMMERCIAL FINANCE, LLC**
**AND**
**GROWTH LENDING LLC**

This Agreement ("Agreement") is entered into as of August 15, 2023, by and between Waterside Commercial Finance, LLC, a Delaware limited liability company ("Waterside"), and Growth Lending LLC a limited liability company organized under the laws of the State of Georgia      ("Growth Lending").

## 1.  Scope of Services

Waterside shall introduce potential funding opportunities to Growth Lending, facilitating the lending process by brokering loans between potential borrowers and Growth Lending.

## 2. Compensation

    a. <u>Retroactive Application</u>: The fee structure outlined in this Section 2 shall apply retroactively to all loans introduced by Waterside to Growth Lending from January 1, 2023, to August 15, 2023 ("Relevant Period"). Growth Lending acknowledges and agrees that it owes Waterside fees for any past loans that were introduced by Waterside in accordance with this fee structure, should they be executed.

    b. <u>Initial Fee</u>: Upon the closing of any loan facilitated by Waterside during the above-mentioned period, Growth Lending agrees to pay Waterside a fee equivalent to twenty-five basis points (25 bps) of the total loan amount. This fee shall be paid     at the time of loan closing.

    c. <u>Exit Fee</u>: Upon the repayment of any loan facilitated by Waterside during the above-mentioned period, Growth Lending agrees to pay Waterside an exit fee equivalent to seventy-five basis points (75 bps) of the total loan amount.

    d. <u>Future Engagements</u>: The fee structure specified in this Section 2 is strictly for loans introduced between January 1, 2023, to August 15, 2023. Any future engagements or loans introduced after August 15, 2023, will require a separate agreement detailing the compensation structure, and this Agreement does not imply any willingness by Waterside to accept this or any other fee structure for future loans.

## 2.  Indemnification

Growth Lending shall indemnify, defend, and hold harmless Waterside from and against any and all losses, liabilities, damages, and expenses, including reasonable attorneys' fees and costs, arising out of or related to any loans brokered by Waterside that fail to materialize or any other actions taken or omitted by Growth Lending in connection with such loans.

## 3.  Non-Circumvention



Growth Lending agrees not to, directly or indirectly, engage, communicate, negotiate with, or solicit any borrower introduced by Waterside without the explicit written permission of Waterside for each individual transaction. This includes all prospective      borrowers introduced to Growth Lending in the Relevant Period   .

**4.  Permission to Engage Borrowers**

Growth Lending must obtain explicit written permission from Waterside on a per-deal basis before engaging with borrowers introduced by Waterside in the Relevant Period.

**5.  Term and Termination**

    a.  Term: This Agreement shall be effective as of the date first written above and shall continue until terminated by either party as set forth below.

    b.  Termination: Either party may terminate this Agreement upon thirty (30) days written notice to the other party.

**6.  Miscellaneous**

    a.  Entire Agreement: This Agreement contains the entire agreement between the parties and supersedes all prior negotiations, understandings, and agreements between the parties.

    b.  Governing Law: This Agreement shall be governed by and construed in accordance with the laws of the State of New York     without regard to its conflicts of laws principles.

    c.  Amendments: No amendment or modification of this Agreement shall be valid unless in writing and signed by both parties.

    d.  Binding Effect: This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.



IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement to be effective the Effective Date.

**WATERSIDE COMMERCIAL FINANCE, LLC.**

By: _Frank Romita_

Name: Frank Romita

Title: Managing Partner

**GROWTH LENDING LLC**

By: _L. Mysyrowicz_

Ladislas Mysyrowicz

Name: _____

Director

Title: _____

# EXHIBIT B

## MUTUAL NON-DISCLOSURE AGREEMENT

**THIS AGREEMENT** is entered into as of January 5th, 2023 (the "<u>Effective Date</u>") by and between:

**Waterside Commercial Finance, LLC ("Waterside")**, with principal offices at 500 Delaware Avenue Ste 1 #1960, Wilmington Delaware, 19899

AND

BOOST&Co Limited ("Counterparty "), with principal offices at _____

15 Crinan Street, London, N1 9SQ

(each a "<u>Party</u>" and together the "<u>Parties</u>").

**IN CONSIDERATION** of the covenants contained herein, the Parties agree as follows:

1.    <u>Introduction</u>. In order to facilitate discussions, meetings and the conduct of business between the Parties with respect to the Purpose (as hereinafter defined) it may be necessary for each of the Parties to disclose Confidential Information (as hereinafter defined) to the other.  Each Party disclosing Confidential Information hereunder is hereinafter referred to as a "<u>Disclosing Party</u>".

2.    <u>Purpose</u>. A Party receiving Confidential Information under this Agreement ("<u>Recipient</u>") shall use the Confidential Information only for the purpose of analysing and assessing a potential transaction between the Parties (the "<u>Purpose</u>").

3.    <u>Representatives</u>. Each Parties', and each of their respective affiliates', directors, officers, employees, contractors, legal representatives, and advisors that (A) have a need to know the Confidential Information for the Purpose, (B) have been informed of Recipient's obligations hereunder, and (C) have entered into a confidentiality agreement with Recipient that contains confidentiality and restricted use obligations that are consistent with the terms of this Agreement and which are reasonably calculated to protect the confidential or proprietary nature of the Confidential Information and prohibit its unauthorized use and disclosure, are hereinafter referred to as "<u>Representatives</u>".

4.    <u>Definition of Confidential Information</u>. In this Agreement, "<u>Confidential Information</u>" means any information, whether printed, in machine readable form or otherwise, that is proprietary or confidential to the Disclosing Party and disclosed to the Recipient, including, without limitation, formulations, know-how, trade secrets, specifications, design plans, drawings, software, hardware, data, research, prototypes, customer information, marketing plans or information, or other business or technical information, and which is (a) disclosed by the Disclosing Party in writing and is marked as "Confidential" (or like designation) at the time of disclosure, or (b) disclosed by the Disclosing Party in any other manner and is identified as confidential at the time of disclosure.

5.    <u>Restrictions</u>.

   (a)    Recipient shall: (i) use the Confidential Information only in connection with the Purpose; (ii) hold all Confidential Information in confidence and only provide access to its Representatives, and (iii) not disclose Confidential Information to any other third party without prior written approval of the Disclosing Party;

2

(b)    Neither Party shall record, make notes of, copy or reproduce the Confidential Information of the other by any means, except to the extent required for the Purpose. All copies, records, notes or reproductions, in whole or in part, shall contain notices identifying them as containing the Confidential Information of the Disclosing Party and shall be protected from unauthorized disclosure and access. Each Party agrees to segregate all Confidential Information of the other from the confidential materials of others in order to prevent commingling; and

(c)    The recipient shall not alter, modify, breakdown or disassemble any materials or compositions containing or constituting Confidential Information of the Disclosing Party.

6.    <u>Standard of Care</u>: Recipient shall protect the disclosed Confidential Information by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use, dissemination or publication of the Confidential Information as the Recipient uses to protect its own confidential information of a like nature. The Parties agree to notify the other immediately upon the discovery of any unauthorized use or disclosure of Confidential Information of the other, and to reasonably cooperate with the Disclosing Party to regain possession of the Confidential Information and prevent its further unauthorized use.

7.    <u>Exclusions</u>: This Agreement imposes no duty of confidence upon a Recipient with respect to Confidential Information which (a) is generally known or in the public domain at the time of disclosure; (b) was in the Recipient's possession before receipt from the Disclosing Party; (c) though originally Confidential Information, subsequently becomes a matter of public knowledge through no fault of the Recipient, as of the date of its becoming part of the public knowledge; (d) is rightfully received by the Recipient without obligations of confidence from a third party who is free to disclose the information; (e) is disclosed by the Disclosing Party to a third party without a duty of confidentiality on the third party; (f) is independently developed by the Recipient without use of, or reference to, the Confidential Information; or (g) is disclosed by the Recipient with the Disclosing Party's prior written approval. In addition, the Recipient may disclose Confidential Information to the extent that the disclosure is required by law or in a judicial or other governmental investigation or proceeding, provided that, to the extent permitted by law, the Recipient gives the Disclosing Party prompt written notice of the compelled disclosure and cooperates with the Disclosing Party, at the Disclosing Party's expense, in seeking a protective order or any other remedies available to limit the disclosure of the Confidential Information.

8.    <u>Acknowledgment</u>: Waterside acknowledges and agrees that Waterside and its affiliates (i) are actively engaged in reviewing potential transaction and business opportunities and therefore constantly receiving financial, technical, and business information and proposed financial structures from many parties, which information and financial structures may be similar to those included in the Confidential Information; (ii) may have or could have had a relationship with a competitor, other lender or other interested party to Waterside; and (iii) may lend to, own or otherwise have a commercial relationship with such entity without being in breach of this Agreement or any obligation hereunder, so long as Waterside and its affiliates do not rely on or utilize the Confidential Information.

9.    <u>Injunctive Relief</u>. Recipient acknowledges and agrees that its compliance with its obligations under this Agreement is necessary to protect the business, goodwill and proprietary interests of the Disclosing Party, and that the Recipient's breach of any of these obligations may give rise to irreparable injury to the Disclosing Party that cannot be adequately compensated with monetary damages. Accordingly, the Recipient agrees that the Disclosing Party will be entitled to seek injunctive relief against the breach, or threatened breach of this Agreement, and specific performance of its obligations hereunder, without being required to post a bond. The injunctive relief contemplated hereunder is in addition to any other legal or equitable remedies available.

10.    <u>Rights in Confidential Information</u>: All right, title and interest in and to the Confidential Information and all media upon which Confidential Information is stored or recorded shall remain the property of the Disclosing Party and the Confidential Information shall be held in trust by the Recipient for the Disclosing Party. No license of any patent right, copyright or other rights in the Confidential Information, other than the

licenses necessary to enable the recipient to use the Confidential Information for the Purpose, is granted hereby.

11.   <u>Return of Confidential Information</u>:  On receipt of a written demand from the Disclosing Party, or in any event upon the termination of this Agreement, Recipient shall return all Confidential Information, including any copies thereof, and any memoranda, notes or other documents relating to the Confidential Information, or at the Disclosing Party's option, shall certify in writing its destruction and, in the case of Confidential Information stored electronically, its deletion and removal from all computer systems, except that one (1) copy of such Confidential Information may be kept by Recipient in its confidential files for record keeping and archival purposes only, subject to the confidentiality restrictions expressly set forth herein.

12.   <u>Disclosure Period</u>: This Agreement governs Confidential Information disclosed by the Parties between the Effective Date and the date that falls one (1) year thereafter. Either Party may terminate this Agreement for any reason by giving thirty (30) days prior written notice to the other Party.

13.   <u>Warranty</u>: Each Disclosing Party warrants that it has the right to make the disclosures under this Agreement. ANY INFORMATION EXCHANGED UNDER THIS AGREEMENT IS PROVIDED "AS IS" AND NO OTHER REPRESENTATIONS, CONDITIONS OR WARRANTIES, WHETHER EXPRESS OR IMPLIED, ARE MADE BY EITHER PARTY UNDER THIS AGREEMENT WITH RESPECT TO THE CONFIDENTIAL INFORMATION DISCLOSED HEREUNDER.

14.   <u>No Obligation</u>: Neither Party has an obligation under this Agreement to purchase any service or item from the other Party or to enter into any further agreement with the other with respect to the subject matter hereof or otherwise. Neither Party has an obligation under this Agreement to offer for sale products using or incorporating the Confidential Information.  The Disclosing Party may, at its sole discretion, offer such products for sale and may modify them or discontinue sale at any time.

15.   <u>No Agency</u>: The Parties do not intend that any agency or partnership relationship be created between them by this Agreement.

16.   <u>Assignment</u>: Neither Party shall assign or transfer any rights or obligations hereunder without the prior written consent of the other.

17.   <u>Amendments</u>: All amendments or modifications to this Agreement must be made in writing and must be signed by both parties.

18.   <u>Survival</u>:  Sections 5, 6, 7, 8, 9, and 12 to 22 shall survive any termination of this Agreement.

19.   <u>Notices</u>: Notices hereunder shall be in writing and shall be deemed duly given upon delivery to the Parties at the address set forth on the first page hereof.

20.   <u>Entire Agreement</u>:  This agreement sets forth the entire agreement with respect to the Confidential Information disclosed hereunder and supersedes all prior or contemporaneous agreements relating to such Confidential Information, whether written or oral.

21.   <u>Discussions</u>:  Neither Party shall publicize or disclose beyond those persons to whom Confidential Information may be disclosed hereunder the existence and the terms of this Agreement or the discussions that give rise to this Agreement and all such information shall be deemed Confidential Information for all purposes hereof.

22.   <u>Governing Law</u>: This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, USA and the federal laws of the USA applicable therein. The Parties hereby attorn to the jurisdiction of the courts of the State of Delaware.

4

23.    <u>Binding Effect</u>: Subject to the limitations set forth in this Agreement, this Agreement shall enure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this agreement as of the Effective Date.

**WATERSIDE COMMERCIAL FINANCE, LLC**

By: _____
    Frank Romita
    Managing Partner
    frank@watersidecf.com

**Counterparty**

By: _____
    Lance Mysyrowicz
    BOOST&Co Limited
    Partner
    lance@boostandco.com